Andrew GOLUB, Plaintiff,

v.

THE CITY OF NEW YORK, et al. Defendants.

No. 03 Civ. 0239(SHS).

United States District Court, S.D. New York.

Aug. 18, 2004.

Antonia C. Kousoulas, Kousoulas & Associates, P.C., New York City, for Andrew Golub, Plaintiff.

Celena R. Mayo, Lead Attorney, New York City, Christine Rene Abbenda, Lead Attorney, Corp. Counsel of City of New York, New York City, for Michael Markman, James Waters, Janna Amelkin, Alfred Linton, Kevin McKechnie, Defendants.

## OPINION AND ORDER

STEIN, District Judge.

Plaintiff Andrew Golub commenced this action pursuant to 42 U.S.C. § 1983 against defendants New York City, Officers Michael Markman, James Waters, Alfred Linton, Kevin McKenzie of the New York City Police Department (the "NYPD") and Dr. Janna Amelkin, a NYPD psychologist, in connection with his arrest on January 10, 2000 and subsequent criminal prosecution and the January 2002 rejection of his application for the NYPD. All discovery proceedings have concluded in this action and defendants now move for summary judgment as to Golub's remaining claims of false arrest, malicious prosecution, and retaliation in violation of his

First Amendment rights. For the reasons set forth below, defendants' motion is granted and the Complaint will be dismissed in its entirety.

BACKGROUND:

Golub has been a corrections officer with the New York City Corrections Department since April of 1997. In 1997, he also applied for the position of a police officer with the NYPD, but he was initially disqualified by the NYPD due to a large number of prior traffic violations and arrests. However, after submitting a rebuttal to that initial disqualification, his NYPD application was reinstated in 1999. As part of that application process, Golub was required to fill out a Police Officer Candidate Questionnaire. In responding to that questionnaire, he made allegations against certain of his neighbors on Staten Island—including one current and one former police officer—for being affiliated with an organized crime figure and for harassing Golub and his tenants. (Candidate Questionnaire at 2–6)

Golub was also required to undergo a psychological evaluation as part of his NYPD application and was initially interviewed by Dr. Michael White, a NYPD psychologist, in late June of 2000. Dr. White was unaware that Golub had made allegations of corruption and harassment against police officers in this neighborhood. Although he harbored some concerns due to Golub's "guarded" demeanor, Dr. White "did not find sufficient reasons for disqualification." (Candidate Psychological Disqualification Summary dated 7/9/1999 at 3–4).

Approximately two weeks later, Dr. White conducted a follow-up psychological interview after he received a copy of Golub's response to the police candidate questionnaire and became aware of Golub's allegations. Dr. White wrote in his notes that the interview confirmed Go-lub's thought process as expressed in the written allegations. He found that Golub exhibited signs of "hyper-vigilance" and "poor judgment." (7/9/1999 Disqualification Summary at 3–4) Dr. White recommended that Golub be disqualified for police service due to "poor judgment," "provocativeness," and "poor interpersonal skills," (id. at 1) and Golub's application to join the NYPD was rejected.

Around that time, Golub was living in an apartment with a roommate, Jose Ingles. Their relationship had become strained because, according to Golub, Ingles often entertained guests in the evenings and made a great deal of noise. (Plaintiff's Local Rule 56.1 Statement at ¶ 45–47) In the evening of January 9, 2000, Golub returned to his apartment and found Ingles present with three other people. (Id. at ¶ 48) A heated argument ensued and Ingles called 911 and made an official complaint against Golub for menacing him with a firearm and for assaulting Ingles's girlfriend. Early the next morning, Golub was arrested by officer McKenzie, acting under the direction of Deputy Inspector Waters.

A misdemeanor complaint was filed against Golub, charging him with menacing and harassment. Although those charges were dismissed on speedy trial grounds at a May 2000 Criminal Court hearing after Golub negotiated a compromise with Ingles and Amin, who agreed not to pursue the criminal complaint in exchange for the return of some of their personal property still in Golub's possession. (Transcript of May 10, 2000 Court Proceeding at 2–3; Ingles's General Release dated 4/14/2000 at 2).

In 2001, Golub again applied to join the NYPD as a police officer. After passing the requisite civil service and physical exams, Golub was evaluated by Dr. Amelkin,

who found that Golub "had a long history of extremely serious difficulties with interpersonal relationships, excessive suspiciousness and hypervigilantism," as well as "the tendency to overreact to interpersonal problems and [to] use poor social judgment." (Psychological Disqualification Summary dated 7/6/2001 at 5) Dr. Amelkin again disqualified Golub on psychological grounds—as Dr. White had two years prior—citing his "poor judgment," "poor interpersonal skills," and "excessive suspiciousness." (*Id.* at 1) That disqualification was affirmed by Dr. DuPlak, the Director of Psychological Services for the NYPD, and Golub was notified of the rejection of his NYPD application in January 2002.

A year later, Golub commenced this action. Over the course of this litigation, Golub has voluntarily withdrawn numerous claims asserted in his Complaint, including claims for deprivation of his liberty interest, violation of his right to equal protection, defamation, tortious interference with contract, and failure to intervene. As stated above, three claims remain. First, Golub alleges that the 2002 rejection of his NYPD application violated his rights under the First Amendment to the United States Constitution because that rejection had been in retaliation for his allegations of corruption and harassment against certain police officers. He also alleges that his January 2000 arrest and subsequent criminal prosecution violated his right to due process under the Fifth and Fourteenth Amendments because the defendant officers lacked probable cause for that arrest and prosecution.

Before proceeding to the merits of the parties' legal arguments, a bit of housekeeping is in order. Insofar as Golub continues to maintain his claim for retaliation against defendants Linton, McKenzie, and Waters and to maintain his claims for false arrest and malicious prosecution as

against Dr. Amelkin, they must be dismissed: Golub has adduced neither a whit, jot nor title of evidence against those defendants. Moreover, he failed to address those claims in his opposition papers to defendants' motion, which seeks dismissal of those claims for lack of personal involvement by those defendants. *See Anyan v. New York Life Insurance Co.,* 192 F.Supp.2d. 228, 237 (S.D.N.Y.2002).

*SUMMARY JUDGMENT STANDARD:*

In evaluating a motion for summary judgment, the Court "may not weigh the evidence" but is required to "view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *See Hayut v. State University of New York,* 352 F.3d 733, 743 (2d Cir.2003). The moving party is entitled to summary judgment if the record, considered as a whole, "show[s] that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). An issue of fact is genuine if evidence "is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *See Overton v. New York State Div. of Military and Naval Affairs,* 373 F.3d 83, 89 (2d Cir.2004) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

*DISCUSSION:*

False Arrest Claim

*A. Legal Standards:*

██ A claim for false arrest asserted pursuant to 42 U.S.C. § 1983 has four elements: (1) that the defendants intended to confine the plaintiff; (2) that the plaintiff was conscious of his confinement; (3) that the plaintiff did not consent to that

confinement; and (4) the confinement was not otherwise privileged. *See Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir.2003). Because police officers are empowered to effect an arrest based on probable cause, "the existence of probable cause to arrest ... is a complete defense to an action for false arrest." *See Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir.2001). Furthermore, because the arrest in this action had been made without a warrant, the defendants bear the burden to demonstrate the existence of probable cause. *See Wu v. City of New York*, 934 F.Supp. 581, 586 (S.D.N.Y.1996).

■ Probable cause to arrest is present when "the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonable trustworthy information to justify a person of reasonable caution in believing that an offense has been committed by the person to be arrested." *See United States v. Gagnon*, 373 F.3d 230, 234 (2d Cir.2004) (internal quotation omitted). Because the determination as to existence of probable cause is an objective one, the subjective intent of the arresting officer is not relevant. *See Arkansas v. Sullivan*, 532 U.S. 759, 771–72, 121 S.Ct. 1876, 149 L.Ed.2d 994 (2001).

### B. Facts:

In the early evening of January 9, 2000, Golub returned to his apartment from work and found that his roommate Ingles and Ingles's girlfriend, Christine Amin, were there with two guests—Collado and McDermott. According to Golub, trash had been strewn throughout the apartment and an argument began and escalated.

After the confrontation, Golub left the apartment and went to the 109th police precinct to register a harassment complaint against Ingles and Amin. While he was at the police station, Ingles made a 911 call and reported that plaintiff had menaced him and assaulted Amin. In response to that report, a patrol officer, defendant Kevin McKenzie, drove to Golub's apartment and "took a report" from Ingles. (McKenzie Dep. at 19)

Ingles, Amin, Collado and McDermott were then taken to the 109th precinct, where Golub had remained after he was told to wait. At the police station, police officers again obtained additional information from Ingles, Amin and their friends regarding their confrontation with plaintiff, but did not check whether Ingles had a record of arrests or convictions. (Plt. Stmt. at ¶ 72) At the 109th precinct, an EMS technician tended to Amin, who declined to be taken to a hospital for further medical treatment. (McKenzie Dep. at 21, 50) McKenzie prepared a criminal complaint against Golub, which Ingles signed—certifying that Golub "verbally threaten[ed Ingles's] life while displaying a licensed firearm (Smith & Wesson 9 MM), causing [Ingles] to fear imminent serious physical injury." (Def. Stmt. at ¶ 35).

Due to Golub's status as a corrections officer, McKenzie consulted with defendant Waters, the station commander for the 109th precinct that evening. (McKenzie Dep. at 28–29) Waters decided, on the basis of McKenzie's report, that Golub should be arrested. (Waters Dep. at 23) McKenzie effected that arrest and Golub was arraigned on the following day and released on his personal recognizance.

### C. Analysis:

#### i Markman and Linton:

■ As a preliminary matter, defendants Markman and Linton are entitled to summary judgment as to this false arrest claim as well as Golub's claim for malicious prosecution: There is absolutely no evidence of their personal involvement in Go-

lub's arrest and prosecution. Instead, there are only Golub's conjectures about the existence of an elaborate conspiracy involving Markman, Linton and Ingles. (Plt. Stmt. at ¶ 86–91) Golub alleges that because Linton knew Ingles in a personal capacity and because Linton was a detective in the NYPD, Linton had conspired with Ingles, under Markman's direction, to "put a case on" Golub. (Golub 10/3/03 Dep. at 149–151) Golub further alleges, without any evidentiary support, that Linton or Markman arranged for Ingles to have friends present in Golub's apartment on January 9, 2000 and had Ingles file a false complaint in order to "illegitimately arrest [Golub], set [him] up and harass [him]." (Golub 10/17/03 Dep. at 18–19).

There is, however, no evidence in the record to support those conjectures. As is well-recognized in the Second Circuit, mere speculations and "conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment." *See Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003); *Lipton v. County of Orange,* 315 F.Supp.2d 434, 448 (S.D.N.Y. 2004). Accordingly, Golub's false arrest and malicious prosecution claims must be dismissed as to defendants Markman and Linton.

ii *McKenzie and Waters:*

Golub and Ingles provided two sharply divergent account of what exactly had taken place in the course of their confrontation in the evening of January 9. According to the police reports and Ingles's sworn statement, plaintiff became enraged at Ingles and threw plates at Amin, hitting her in the ribs. Ingles also asserted that plaintiff threatened his life by brandishing a firearm. Plaintiff, in contrast, denied ever having thrown plates at Amin or having threatened Ingles with a firearm. (Plt. Stmt. at ¶ 51) Golub admitted that he had

been angered by Ingles's behavior and that he yelled at Ingles and his guests. He also admitted to having shoved a washing machine—sending some plates crashing to the floor; but he maintained that it would have been impossible for those plates to have hit Amin. (*Id.* at ¶ 50) According to Golub, he left the apartment and went to the 109th precinct in order to avoid an escalation of the confrontation. (*Id.*)

■ This Court is not called upon to decide which of the two disparate accounts of events delineated above is more accurate when it inquires into whether probable cause existed for Golub's arrest. Rather, the task is to examine the facts and circumstances facing defendants Waters and McKenzie and to determine objectively whether those facts warranted a reasonable belief that Golub had assaulted Amin or menaced Ingles. Ordinarily, a police officer has probable cause to arrest if he or she has been "advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime," unless other circumstances cast doubt on the putative victim's credibility. *See Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997). Therefore, Ingles and Amin's allegations, if reasonably credited by Waters and McKenzie, were sufficient to establish probable cause to arrest Golub.

■ Golub asserts that Waters and McKenzie could not have reasonably credited Ingles and Amin's allegations in light of three sets of circumstances. First, Golub claims that the police officers in the 109th precinct were hesitant to arrest him and that McKenzie reassured him that "everything would be fine" after making the arrest. (Plt. Stmt. at ¶ 57) Those, according to Golub, indicated that the officers, including McKenzie, questioned Amin and Ingles's veracity. Second, Golub contends

that McKenzie and Waters should have checked Ingles's criminal history, which, according to Golub, would have revealed two criminal convictions. (Golub 10/3/03 Dep. at 113) Golub asserts that had defendants McKenzie and Waters been aware of Ingles's prior convictions, they could not have reasonably credited Ingles's allegations. Finally, Golub maintains that the fact that Amin declined to be taken to a hospital for medical treatment further showed that the allegations against him were false. (Plt. Stmt. at ¶ 60) Those arguments are unavailing.

First, even if Golub is correct that the officers were hesitant to arrest him and "were talking to Waters like in disbelief that I had committed what [Ingles] was alleging," (*Id.* at 107–08) the defendant officers-including McKenzie, who had interviewed Ingles and Amin-could nonetheless have found Ingles's allegations reasonably credible.

Second, McKenzie and Waters's failure to check Ingles's criminal history does not undermine their determination as to the existence of probable cause. There was no special reason that required the officers to investigate the criminal history of the complainant. *See Williams v. City of New York*, 02 Civ. 3693, 2003 WL 22434151 at *5 (S.D.N.Y. Oct.23, 2003) (observing that it "would be unreasonable and impractical to require that each complainant be assessed prior to police action regarding the subject of the complaint") (internal quotation omitted). Moreover, a complainant's record of imprisonment, even if known, does not render him or her undeserving of the protection of law enforcement or dictate the police to deem his or her words intrinsically untrustworthy.

Finally, McKenzie was not required to discredit the credibility of Amin's allegations simply because she did not seek medical treatment at a hospital after being examined by an EMS staff. It would be highly anomalous if police officers were required to discredit all complaints from alleged victims of assaults who have not suffered serious injuries. Accordingly, because this Court finds that probable cause for the arrest existed, summary judgment is granted as to Golub's claim for false arrest.

Malicious Prosecution Claim

### A. Legal Standard

■ To sustain his Section 1983 claim for malicious prosecution, plaintiff must proffer evidence that show "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding;" and (4) actual malice. *See Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir.2003). The existence of probable cause for prosecution requires a distinct inquiry from one as to whether probable cause exists for arrest. *See Posr v. Court Officer No. 207*, 180 F.3d 409, 417 (2d Cir.1999). However, as the Second Circuit recently noted, in order for probable cause, which existed at the time of arrest, to "dissipate" prior to commencement of prosecution, "the groundless nature of the charge must be made apparent [to the defendants] by the discovery of some intervening fact." *See Kinzer*, 316 F.3d at 144 (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)).

### B. Analysis

■ As a preliminary matter, while there is no dispute as to the fact that a criminal proceeding was commenced against Golub, defendants assert that the malicious prosecution claim must fail because Golub did not obtain a favorable termination in that proceeding. That ar-

gument is unavailing, however, because both New York law and Second Circuit precedents hold that a dismissal of criminal charges pursuant to New York Criminal Procedure Law § 30.30 for speedy trial purposes constitutes a favorable termination. *See Rogers v. City of Amsterdam,* 303 F.3d 155, 160 (2d Cir.2002) (*citing Smith–Hunter v. Harvey,* 95 N.Y.2d 191, 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000) and *Murphy v. Lynn,* 118 F.3d 938, 949 (2d Cir.1997)).

▮ Nevertheless, defendants are entitled to summary judgment as to Golub's malicious prosecution claim because Golub has not set forth any evidence of involvement by either McKenzie or Waters in his criminal prosecution after the initial arrest and charge. Nor has Golub adduced any evidence that facts had come into McKenzie or Waters's knowledge clarifying the allegedly "groundless nature of [the] charges" against Golub. Accordingly, because probable cause existed at the time of Golub's arrest and because no new facts emerged prior to commencement of his criminal proceeding to dissipate that probable cause, Golub's malicious prosecution claim fails. *See Lowth,* 82 F.3d at 572.

### First Amendment Retaliation Claim

#### A. Legal Standard

▮ To state a *prima facie* case for his First Amendment retaliation claim, Golub must proffer admissible evidence showing that "(1) his speech was constitutionally protected; (2) he suffered an adverse employment action; and (3) a causal connection exists between [his] speech and the adverse employment action so that it can be said that the speech was a motivating factor in the determination [to reject his application for employment]." *See Washington v. County of Rockland,* 373 F.3d 310, 320 (2d Cir.2004). Golub's speech, *i.e.* his allegations of harassment and corrup-

tion, is entitled to constitutional protection if it dealt with "any matter of political, social or other concern to the community." *See Mandell v. County of Suffolk,* 316 F.3d 368, 383 (2d Cir.2003).

At the summary judgment stage, Golub bears the initial burden of proffering some "tangible proof" that retaliatory motive was a substantial contributing factor for the adverse employment decision taken against him. *See Washington,* 373 F.3d at 321. If he discharges that burden, the defendants can nonetheless prevail on summary judgment by a showing of "dual motivation, i.e., that even without the improper motivation," the exact same outcome would have obtained. *See Scott v. Coughlin,* 344 F.3d at 288.

#### B. Facts

In connection with Golub's 2001 reapplication to the NYPD, he was evaluated by Dr. Amelkin, who administered a battery of psychological tests and two personal interviews. According to Golub, Dr. Amelkin "was not prepared" for the first interview and "did not have access to [files in Golub's] folder." (Golub 10/17/03 Dep. at 45) They discussed "some minor points of [Golub's] past." (*Id.*) At that interview, Dr. Amelkin also covered the results of Golub's psychological tests, including the Minnesota test, the Cornell Index and the police questionnaire. (Amelkin Dep. at 31–32) Those objective tests, according to Dr. Amelkin, identified some sources of concern, including Golub's prior arrests; but overall, that initial interview did not raise any "real red flags except for the fact [that Golub] had gone through ... a therapeutic school for trouble[d] kids" and "an arrest ... in 1980 and the arrest in 2000." (*Id.* at 40).

After that first interview, Golub provided Dr. Amelkin with letters of recommen-

dation from his family members and colleagues. (Amelkin Dep. at 52) She also received the files related to Golub's earlier psychological evaluation from Dr. White, as well as a package of materials from Officer Gallo of the NYPD. (*Id.* at 54–57) Before her second psychological interview with Golub, Dr. Amelkin reviewed those documents and also spoke with Dr. White regarding Golub.

Dr. Amelkin's second interview dealt specifically with Golub's earlier allegations regarding corruption and harassment in his Staten Island neighborhood. (Plt. Stmt. at ¶ 33–36) She also discussed with Golub the circumstances of an altercation that resulted in Golub's arrest and the issuance of an order of protection against him in the early 1980s, as well as the circumstances surrounding his 2000 arrest. (*Id.* at ¶ 37; Amelkin Dep. at 64–70, at 96–98, at 136–140).

According to Dr. Amelkin, Golub admitted to exaggerations in his allegations against his Staten Island neighbors and characterized those as "minor problems." (Amelkin Dep. at 60, at 102–103) She also found that he similarly minimized accusations he had previously asserted against his adopted mother in a series of letters furnished to the NYPD. (*Id.* at 92–94) According to Dr. Amelkin, Golub told her that the conflict with his adopted mother had been "no big deal" and "just about the money," even though he conceded he had made serious allegations of malicious persecution, neglect, and physical abuse against her. (*Id.* at 99–100)

In light of those observations, Dr. Amelkin determined that Golub possessed "poor judgment," "poor interpersonal skills," and "excessive suspiciousness." (7/6/2001 Disqualification Summary at 1) Dr. Amelkin testified that, in her opinion, "[excessive] suspiciousness is a danger if a person may pull out a gun too soon." (Amelkin Dep. at

73). She concluded that those character traits—especially "excessive suspiciousness"—disqualified Golub from joining the police because a police officer "is required to carry a firearm, deal with the public and potentially volatile situations." (*Id.*)

### C. Analysis

#### i. *Markman:*

At the outset, defendant Markman is entitled to summary judgment as to Golub's First Amendment retaliation claim because there is no evidence of involvement by him. Golub has failed to adduce any evidence tending to link Markman with his January 2000 arrest, beyond speculations and conclusory allegations. He has similarly failed to produce any evidence linking Markman to Dr. Amelkin's decision to reject his application on psychological grounds. Accordingly, Golub's First Amendment retaliation claim is dismissed as against Markman.

#### ii. *Dr. Amelkin:*

As to Dr. Amelkin, defendants concede that the rejection of Golub's application to join the NYPD was an adverse employment action for purposes of his retaliation claim. As for the first element of Golub's *prima facie* case, defendants assert that his allegations of harassment and corruption in his Staten Island neighborhood were not constitutionally protected speech because they were in Golub's personal interest and did not address a matter of public concern. This contention does not carry the day.

Words can serve the speaker's personal interest yet still address a matter of concern for the community at large. Those interests are not mutually exclusive. *See Johnson v. Ganim,* 342 F.3d 105, 114 (2d Cir.2003) (observing that "mere fact that [plaintiff] took a personal interest in the

subject matter of the speech does not remove [it] from the protection of the First Amendment") (internal citation omitted). One of Golub's allegations dealt with corruption involving organized crime and law enforcement officers. Any such allegation would be a matter of concern for members of the Staten Island community. It also touches upon the integrity and accountability of public institutions, matters of concern for society at large. *See Frank v. Relin,* 1 F.3d 1317, 1329 (2d Cir.1993).

■ Golub has failed, however, to discharge his burden as to the last element of his retaliation claim—to adduce a quantum of "tangible evidence" of causal connection between the rejection of his application and a retaliatory motive on Dr. Amelkin's part. *See Washington,* 373 F.3d at 321. First, the fact that Dr. Amelkin took Golub's allegations into account does not evince a retaliatory motive. Nor is Dr. Amelkin's scrutiny of Golub's motive for making such allegations direct evidence of retaliatory animus. Because Golub had submitted those allegations in response to the police candidate questionnaire, they were part of his file deserving Dr. Amelkin's consideration as part of her psychological evaluation of Golub. The only other set of facts upon which Golub asks this Court to infer the existence of retaliatory motive is the temporal proximity between Dr. Amelkin's knowledge of Golub's allegations and her decision to disqualify him. That does not suffice here.

Psychologists responsible for evaluating candidates for the NYPD like Dr. Amelkin bear an important responsibility to the public for ensuring the quality of the police force. They must have access, to the fullest extent possible, to information relevant to the evaluation of a candidate. Considerations of efficiency and fairness to candidates also dictate that psychologists such as Dr. Amelkin come to conclusions expeditiously after a careful review of evidence. Thus, while temporal proximity between knowledge of a protected activity and an adverse employment action may be sufficient to establish causal connection or retaliatory motive in some cases, cf. *Barry v. New York City Police Dept,* 01 Civ. 10627, 2004 WL 758299 at *8 (S.D.N.Y. Apr.7, 2004), it may not be appropriate for psychologists who are required to consider all relevant evidence to render an instantaneous determination. To hold otherwise would produce the perverse result of psychologists avoiding access to relevant information.

Even if this Court were to find that Golub had discharged his burden to establish a causal connection between the rejection of his application and retaliatory motive, defendants are nonetheless entitled to summary judgment because they have proffered evidence sufficient to show that Dr. Amelkin would have disqualified Golub in the absence of a retaliatory motive. *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994). Accordingly, because Golub has not adduced evidence sufficient to support a *prima facie* case, or alternatively, because defendants have proffered evidence sufficient to discharge their burden under the "dual motivation" test, defendants are entitled to summary judgment as to Golub's claim for First Amendment retaliation.

Claims for Municipal Liability

■ A municipality may be held liable for constitutional deprivations that arise from an official city policy, practice, or custom. *See DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1998); *Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Here, as Golub has not adduced facts sufficient to show that he suffered deprivations of his rights to due process or to protection of the First Amendment, his claims for

municipal liability on the part of New York City also fail.

*CONCLUSION*

For the reasons set forth above, defendants' motion for summary judgment is granted. The Complaint is hereby dismissed in its entirety.